UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR 10-760 CAS | Date | January 20, 2011 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | N/A | | |

| Catherine Jeang | Not Present | Amanda Bettinelli, Not Present<br>Rozella Oliver, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Marcos Joshua Perez | NOT | | X | Anthony Eaglin, DFPD | NOT | | X |

Proceedings:  **(IN CHAMBERS): Defendant's Motion to Suppress Evidence** (filed 9/07/10)

**Defendant's Motion to Suppress Evidence Seized From Vehicle and Fruits Thereof** (filed 9/21/10)

## I. INTRODUCTION

On July 13, 2010, the government filed an indictment charging defendant Marcos Joshua Perez with (1) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A); and (2) possession with intent to distribute methamphetamine on premises where children are present in violation of 21 U.S.C. § 860(a).

On September 7, 2010 and September 21, 2010, defendant respectively filed the instant motions to suppress evidence seized from his residence and his statements, and to suppress evidence from the search of his vehicle and the fruits thereof. The government filed its oppositions thereto on October 1, 2010. Defendant replied on October 13, 2010. On November 29, 2010, December 1, 2010, and December 3, 2010, the Court held an evidentiary hearing on defendant's motions pursuant to Fed. R. Crim. P. 12(b)(3)(C). At the hearing, the declarations of Frank Segura, Luis Pasache, Jonathan Owen and Travis Goodreau, certain audio recordings taken from recording devices worn by Segura, Pasache and Owen, and a police dispatch audio recording were received into evidence as exhibits. In addition, Segura, Pasache, Goodreau, Alejandro Diego Garcia and defendant testified at the hearing. On December 17, 2010, the government filed a supplemental opposition to defendant's motion to suppress evidence.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Defendant filed a reply to the government's supplemental opposition on December 29, 2010. After carefully considering the arguments and testimony of both sides, the Court finds and concludes as follows.

## II.   BACKGROUND FACTS

### A.   Traffic Stop and Vehicle Search

On May 27, 2010, at approximately 1:49 a.m., Glendale police officer Frank Segura conducted a traffic stop of a red Dodge Ram pickup truck. Declaration of Officer Frank Segura (Segura Decl.) ¶¶ 2-3. The vehicle was owned by defendant, but the driver and sole occupant of the pickup truck was Alejandro Diego Garcia ("Garcia"). Segura Decl. ¶ 6.[1] As Segura approached the driver's side of the truck, he observed Garcia reaching into the center console. Opp'n Ex. 3, Glendale Police Report (May 27, 2010). Segura asked Garcia what he was doing, and Garcia responded that he was reaching for his friend's vehicle insurance.[2] Reply Ex. D, Transcript of Audio Recording of Officer Segura 1. Segura asked who owned the vehicle, and Garcia answered that it belonged to his friend, and that he was driving it back to his friend's house after picking it up for him in Whittier. Id.

Segura asked Garcia if he had ever been arrested, and if so, what he had been arrested for. Reply Ex. D. Garcia revealed that he had been arrested for receipt of stolen property, burglary, driving on a suspended license, and a probation violation. Id. Segura then asked Garcia the name of the owner of the vehicle, and Garcia responded, "His name is Marcos," but did not reveal the owner's last name. Id. Garcia provided Segura with his California identification card, and a subsequent wants and warrants check revealed that Garcia had an outstanding warrant for a traffic violation. Id.; Opp'n Ex. 3; Segura Decl. ¶ 5. Segura then asked Garcia if there were any drugs or weapons in the vehicle. Opp'n Ex. 3; Reply Ex. D. Garcia replied, "No. Nothing in here." Reply Ex. D.

Based on what Segura perceived to be Garcia's suspicious behavior, and the fact that Garcia had an outstanding warrant, he requested back-up assistance. Opp'n Ex. 3. Officer Travis Goodreau responded to the scene. Id.

---

[1] At the suppression hearing, Segura testified that he conducted the traffic stop because he observed that the driver of the vehicle was not wearing his seatbelt. Garcia testified that he was wearing his seatbelt.

[2] A substantial portion of the encounter between Garcia and the officers was captured by audio recording devices worn by the officers. See Reply Exs. C, D, E and F.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

## CRIMINAL MINUTES - GENERAL

After Goodreau arrived, Segura asked Garcia to step out of the vehicle and searched his person for weapons. <u>Id.</u>; Reply Ex. D. Garcia had a bulge in his right front pocket and Segura reached in the pocket and discovered $3,976 in cash. Opp'n Ex. 3. Segura also removed Garcia's wallet from his rear pants pocket and gave it to Goodreau. <u>Id.</u> Goodreau opened the wallet and discovered a yellow Post-It with a case number written on it. <u>Id.</u> Goodreau asked Garcia what the case number was for, and Garcia answered, "The case was for uhm . . . driving on a suspended license or the hit and run, one of those two." Reply Ex. D. Segura then telephoned the Whittier Police Department to inquire about the case number found in Garcia's wallet. Opp'n Ex. 3. Whittier Police Department Sergeant Ramos informed Segura that Garcia had recently been arrested for transportation for sale of narcotics. <u>Id.</u>; Opp'n Ex. 2, Whittier Police Department Arrest Report for Alejandro Diego Garcia.

The following colloquy then occurred:

Segura: Okay. I'm gonna go ahead and look inside your . . . You have a problem with me searching your car?

Garcia: That's not my car but go ahead. I can't say nothing about it.

Segura: Alright. Is there anything illegal in the car?

Garcia: I don't know.

Segura: Okay. Listen, we're gonna start over here. Honestly. Okay, we're gonna start over. Listen. Look at me when I talk to you. I don't mean any disrespect or anything like that. I want you to . . . look at me. I want you to be totally straight up with me. I have been doing this for what, twelve years now. I can honestly tell you I have searched thousands of cars. If there is anything illegal in that car, I would say about 98% of the time I find whatever is in that car. If there is anything illegal in that car that you are aware of you need to let me know right now cause I guarantee you . . .

Garcia: Not that I am aware of. Not that I am aware of. No sir, I am . . .

Segura: Listen to me, I guarantee you that if I find something in there that you failed to disclose, whatever it may be, you will find yourself in the back seat of my car.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA            O

# CRIMINAL MINUTES - GENERAL

| | |
|---|---|
| Garcia: | That's fine then, can I call my lawyer, I didn't do anything wrong I need my license . . . |
| Segura: | No. No. You're not under arrest. Listen, all I'm asking is there anything illegal in there? That's all I'm asking. |
| Garcia: | No. |
| Segura: | Ok. |

Reply Exs. C and D.

    Segura proceeded to search the vehicle where he located a cell phone belonging to Garcia on the driver's seat and a global positioning system ("GPS") navigational unit on the dashboard near the steering wheel. Segura Decl. ¶ 4; Opp'n Ex. 3. The GPS was turned on and displayed the roadway as well as an en route destination of 10220 Langmuir Avenue. Opp'n Ex. 3. Segura ran a computer check of the vehicle's registration and learned that the vehicle was registered to defendant with a listed address of 10220 Langmuir Avenue, Sunland, California. Id.

    Segura reviewed the text messages on the cell phone, the substance of which suggested to him that Garcia was involved in narcotics sales. Segura Decl. ¶¶ 7–8; Opp'n Ex. 3. Segura also reviewed photographs on Garica's cell phone. Segura Decl. ¶¶ 7–8. One photograph showed a white plastic cooler with a handle on one end. Id. Inside the cooler were two clear plastic bags containing what appeared to be cocaine or methamphetamine. Id. The photograph also showed four additional clear plastic bags containing what appeared to be methamphetamine or cocaine lying next to the white cooler. Id.

    Segura and Sergeant Pasache, who arrived on the scene of the traffic stop after Segura radioed for back-up, decided to proceed to defendant's residence to verify if the vehicle was stolen, and to determine whether drugs were at the residence. Id. ¶ 9.

    **B.    Search of Defendant's Residence**

    At approximately 5:00 a.m., Glendale Police Officers arrived at defendant's residence. Segura Decl. ¶ 10. The officers knocked on defendant's front door and defendant answered, but

did not open the door all the way.[3] Id. ¶ 9. Because defendant had his hands behind his back, Segura became concerned that defendant might be armed with a weapon. Id. ¶¶ 9–10. Segura asked defendant to show his hands and defendant initially complied, but then continued to obscure his hands from the officers' view. Upon Segura's request, defendant provided the officers with his California driver's license. Id.

Using the information from defendant's driver's license, Officer Owen conducted a wants and warrants check on defendant using his handheld radio via dispatch. Owen Decl. ¶ 7; Segura Decl. ¶ 11. The wants and warrants check revealed that defendant was on active parole for weapons possession and had two outstanding warrants. Segura Decl. ¶ 11; Reply Ex. C. At the suppression hearing, Segura testified that the radio dispatch provided no indication of the year of defendant's conviction, the length of defendant's sentence, when defendant's parole commenced or ended, or that defendant was subject to a search condition as a term of his parole. Segura testified that it is his belief, based on his training and experience, that any individual on active parole for a weapons charge is subject to a search condition.

Because defendant was on active parole for weapons possession, he had two outstanding warrants, and his hands were concealed behind his back, Segura approached defendant at or just inside the threshold of the door to the residence, intending to conduct a pat-down search for weapons. Segura Decl. ¶ 12. Segura testified that as he approached, defendant clenched both fists, raised his arms to shoulder height and swung downward on Segura's right arm. Id. ¶ 13. As a result of the blow, Segura lost control of defendant and the pair fell backward into the living room, landing a few feet from the doorway. Segura testified that defendant continued to strike him in the cheek and nose. During the struggle, the other officers entered the residence where they restrained and handcuffed defendant. Id.; Declaration of Sergeant Luis Pasache (Pasache Decl.) ¶ 12.

At the suppression hearing, defendant testified that he never struck Segura or any other officer, and that Segura tackled him into his living room. Defendant testified that one of the officers had his hands around defendant's neck while defendant was on the ground, and that defendant attempted to remove the officer's hands from defendant's neck to prevent choking.

After defendant was restrained, Pasache conducted a protective sweep of the residence.

---

[3] Portions of the encounter between defendant and the officers were recorded by audio recording devices worn by several officers at the scene. The audiotape and accompanying transcript of the conversation were received into evidence and the audiotape was played at the suppression hearing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA   O

**CRIMINAL MINUTES - GENERAL**

Pasache Decl. ¶ 15. During the protective sweep, officers located a cooler in the attached garage that was identical to the one the officers observed on Garcia's cell phone photograph, which contained large bags of what appeared to be illegal drugs. Id. ¶ 16; Segura Decl. ¶ 16.

At that point, Pasache asked defendant for consent to search the residence, which request defendant declined. Pasache Decl. ¶ 17. Pasache then instructed Segura and Goodreau to return to the police station and obtain a search warrant for the location. Id. ¶¶ 18–19; Segura Decl. ¶ 17. According to Pasache, approximately twenty to thirty minutes later, defendant orally consented to a search of his residence. Pasache Decl. ¶ 21. Pasache then activated his audio recording device and again obtained defendant's and defendant's wife's consent to search the residence. Id. Pasache also obtained written permission to search forms for both defendant and defendant's wife. Opp'n Ex. 4.

The subsequent search of the residence revealed: (1) 16 pounds of methamphetamine stored inside 17 PVC pipes in the garage; (2) 12.4 ounces of methamphetamine in a white cooler in the garage; (3) acetone in the garage; (4) two ounces of heroin in a box in a kitchen cabinet; (5) a black digital scale concealed in a box located in a kitchen cabinet; (6) 3.5 ounces of methamphetamine in a box located in a kitchen cabinet; and (7) a "pay/owe" sheet in a notebook found in the master bedroom in defendant's closet.

## III. DISCUSSION

Defendant moves to suppress physical evidence from the search of his vehicle driven by Garcia, including evidence of the navigation system, and the fruits thereof. Defendant also moves to suppress the drugs and other evidence discovered during the search of his residence, as well as statements he made at his residence.

### A. Suppression of Evidence Seized From Defendant's Vehicle

Defendant moves to suppress evidence found in his vehicle on the grounds that the police lacked probable cause to conduct the search, did not obtain the necessary consent of the driver, Garcia, and if consent was given, it was not free and voluntary. Mot. at 4. The government responds that the search of defendant's vehicle was conducted pursuant to lawful consent. Opp'n at 9.

#### 1. Propriety of the Traffic Stop

At the suppression hearing, the government asked the Court to make a credibility determination as to the legality of Segura's original traffic stop of the pickup truck driven by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Garcia due to conflicting testimony as to whether Garcia was wearing his seatbelt at the time Segura initiated the traffic stop.

A traffic stop is justified if the police officer has a reasonable suspicion that a traffic violation has occurred. United States v. Lopez-Soto, 205 F.3d 1101, 1004–05 (9th Cir. 2000). "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" Id. (quoting United States v. Michael R., 90 F.3d 340, 346 (9th Cir. 1996)).

Segura testified unequivocally that he observed Garcia driving the pickup truck without wearing his seatbelt, which is a violation of California Vehicle Code section 27315(d)(1).[4] Although it was 1:49 a.m. and dark outside at the time of the stop, Segura testified that he was able to see that Garcia was not wearing his seatbelt because the truck Garcia was driving passed perpendicularly in front of Segura's police cruiser, and the cruiser's front headlights were illuminated. Segura testified that he got a clear view of Garcia operating the vehicle without his seatbelt when the truck passed in front of his cruiser. On the other hand, Garcia testified that he was wearing his seatbelt at all times while driving the truck.

Having observed Segura and Garcia at the suppression hearing, and having considered the totality of their testimonies and the evidence, the Court finds Segura's testimony that he observed Garcia not wearing his seatbelt credible. Accordingly, the Court concludes that Segura had a reasonable suspicion that Garcia was committing a traffic violation, and therefore the initial stop was justified.

 2.  **Consent to Search the Vehicle**

The government argues that the search of defendant's vehicle was a lawful consent search.[5]

---

[4] Section 27315(d)(1) provides, in relevant part: "A person shall not operate a motor vehicle on a highway unless that person and all passengers 16 years of age or over are properly restrained by a safety belt." Cal. Veh. Code § 27315(d)(1).

[5] It does not appear that defendant is challenging Garcia's authority to consent to the search of the vehicle. Nevertheless, the government argues that because Garcia was the driver and sole occupant of the vehicle at the time of the traffic stop, he had authority to consent to the search of the vehicle. Opp'n at 9–10 (citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (the government may obtain voluntary consent "either from the individual whose property is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA           O

**CRIMINAL MINUTES - GENERAL**

It is established law that "a search conducted pursuant to a valid consent is constitutionally permissible." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Whether consent to search is voluntarily given is determined by the totality of the circumstances. Id.; United States v. Patayan Soriano, 361 F.3d 494, 501 (9th Cir. 2004). The Ninth Circuit has identified five factors for the court to consider in determining the voluntariness of consent to a search: "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." United States v. Jones, 286 F.3d 1146, 1152 (9th Cir. 2002). The government has the burden to prove that consent was freely and voluntarily given. Patayan Soriano, 361 F.3d at 501.

The government maintains that Garcia consented to the search of the vehicle voluntarily, and nothing about the context of the traffic stop suggests that consent was coercively obtained. Opp'n at 10–11.

Defendant replies that Garcia did not consent to a search of the vehicle or the contents therein. Reply at 6. Defendant argues that the dialogue between Garcia and Segura indicates that Segura never unequivocally requested consent to search the vehicle and Garcia never unequivocally granted such a request.[6] Id. at 7. Defendant contends that Segura first *told*

---

searched or from a third party who possesses common authority over the premises.") (internal citations omitted); United States v. Brannan, 898 F.2d 107, 108 (9th Cir. 1990) (an individual possesses common authority to consent to a search in those circumstances where "mutual use of the property by those generally having joint access or control such that it is reasonable to recognize that each of the parties has the right to permit inspection and has assumed the risk that the other party might consent to a search.")). The government further contends that the evidence seized from the vehicle is admissible against defendant, despite his absence at the time of the search. Id. at 9 (citing United States v. Matlock, 415 U.S. 164, 170 (1974) ("the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.")).

[6] Defendant's argument is based upon the following exchange:

Segura:     Okay. I'm gonna go ahead and look inside your . . . . You have a problem with me searching your car?

Garcia:     That's not my car but go ahead. I can't say nothing about it.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                O

**CRIMINAL MINUTES - GENERAL**

Garcia that he was going to look inside the vehicle, before *asking* Garcia for consent. Id. Defendant further contends that implicit in Garcia's response was that Garcia had a problem with the search of his vehicle. Id. Defendant argues that even when Segura told Garica, "Okay. Listen, we're gonna start over here. Honestly. Okay, we're gonna start over," Garcia did not consent and instead requested to speak with his lawyer. Id. at 8 (citing Reply Ex. D).

Defendant further replies that Garcia stated throughout the encounter that he did not give permission to the officers to search, see Reply Ex. E, Transcript of Audio Recording Owen 2 (Garcia: "I did not give you guys permission to look through my phone either. So I do not know. I know you guys looked through my phone and stuff. . . ."); Reply Ex. F, Transcript of Audio Recording Segura 3 ("I didn't give permission to look through my phone. I did not give permission for anything. . . .), and repeatedly asked to speak to his attorney, see Reply Exs. D, E and F. Id. at 8–9. Defendant contends that even if the Court construes Garcia's original statement as consent to search the vehicle, Garcia was free to delimit or withdraw his consent at any time. Id. at 9 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)).

The Court concludes that the search of defendant's vehicle, and subsequent seizure of the navigational system, was conducted pursuant to lawful consent.[7] The Court finds that Garcia had authority to consent to the search of defendant's vehicle. See Brannan, 898 F.2d at 108. Furthermore, in light of all the surrounding circumstances, a reasonable person would conclude from the exchange between Segura and Garcia that Garcia voluntarily consented to the search of the vehicle. See United States v. Cannon, 29 F.3d 472, 477 (9th Cir. 1994) (finding consent where suspect told officer to "go ahead" and look in his vehicle). Contrary to defendant's argument, there is no evidence that the officers exceeded the permissible scope of Garcia's consent to search the vehicle in obtaining the navigation system. It is true that Garcia was free to withdraw his consent to search the vehicle at any time prior to the completion of the search, however, Garcia's revocation does not operate retroactively to render inadmissible evidence

---

Reply Ex. D.

[7] It is unclear from defendant's motion whether he is challenging the search of Garcia's cell phone, which was found in the vehicle. Because the cell phone is not defendant's property, defendant has no subjective expectation of privacy in the cell phone, and thus no standing to challenge the admissibility of evidence derived from the search of the cell phone. See Rawlings v. Kentucky, 448 U.S. 98, 104–05 (1980) (defendant had no legitimate expectation of privacy in an acquaintance's purse at the time that it was searched and therefore could not challenge the validity of the search).

acquired from the discovery of the navigational unit prior to the time of revocation.[8]  See Jones v. Berry, 722 F.2d 443, 449 n.9 (9th Cir. 1983) ("No claim can be made that items seized in the course of a consent search, if found, must be returned when consent is revoked. Such a rule would lead to the implausible result that incriminating evidence seized in the course of a consent search could be retrieved by a revocation of consent.").  Accordingly, the Court finds that the search of defendant's car and seizure of the navigational unit was constitutionally permissible.[9]

### B. Suppression of Evidence Seized From Defendant's Residence and Defendant's Statements

Defendant moves to suppress evidence found at his residence and his statements to police on the grounds that he was unlawfully detained and the evidence was discovered during a warrantless search.  Mot. at 4–7.

The Fourth Amendment protects the rights of people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures.  United States v. Place, 462 U.S. 696, 700 (1983).  The protective force of the Fourth Amendment is at its zenith when the sanctity of the home is involved.  See United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001).  "'[S]ubject only to a few specifically established and well-delineated exceptions,' a search is presumed to be unreasonable under the Fourth Amendment if it is not supported by probable cause and conducted pursuant to a valid search warrant."  United States v. Caseres, 533 F.3d 1064, 1070 (9th Cir. 2008) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

#### 1. Initial Knock-and-Announce

Fourth Amendment protection reaches the curtilage of a home, which is defined as "the

---

[8] Segura also testified that he observed defendant's address displayed on the navigational system's screen, which was located on the vehicle's dashboard, even before he conducted the vehicle search.  See Segura Decl. ¶ 4.  Therefore defendant's address, which was displayed on the navigation system's screen, is also admissible under the "plain view" doctrine.  See Coolidge v. New Hampshire, 403 U.S. 443, 465–68 (1971), overruled on other grounds, 496 U.S. 128 (1990)).

[9] Because the Court finds that the search of defendant's vehicle and seizure of the navigational unit was conducted pursuant to lawful consent, the Court does not reach the question of whether the search of defendant's residence and statements he made during that search must be suppressed because they are the poisonous fruits of the vehicle search.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA      O

**CRIMINAL MINUTES - GENERAL**

area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." Oliver v. United States, 466 U.S. 170, 180 (1984) (internal quotations omitted). The Ninth Circuit has repeatedly stated, however, that, "anyone may 'openly and peaceably knock [on an individual's door] with the honest intent of asking questions of the occupant thereof–whether the questioner be a pollster, a salesman, or an officer of the law.'" Hammett, 263 F.3d at 1059 (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)) (alterations in original).

In this case, the officer's initial interview of defendant at his doorstep was lawful. The officers knocked on defendant's door wearing their uniforms, with their weapons holstered, intending to further the investigation deriving from the traffic stop of defendant's vehicle. Responding to the knock, defendant opened the door, verified that he had authorized Garcia to drive his truck, provided responses to routine questions, and complied with the officers' request to provide them with his driver's license. Nothing about the initial knock-and-announce violated defendant's Fourth Amendment rights. See Hammett, 263 F.3d at 1059.

### 2. Defendant's Outstanding Warrants

The government argues that the officers had authority to enter defendant's residence to arrest him based on the existence of two outstanding warrants for defendant's arrest. Gov't Supp. Mem. at 3–4. A valid arrest warrant founded on probable cause carries with it the authority to enter the residence of the person named in the warrant in order to execute the warrant so long as there is reason to believe that the suspect is within. Payton v. New York, 445 U.S. 573, 603 (1980); see Steagald v. United States, 451 U.S. 204, 214 n.7 (1981) ("In Payton, of course, we recognized that an arrest warrant alone was sufficient to authorize the entry into a person's home to effect his arrest.").

Here, defendant voluntarily provided the officers with his driver's license, and Owen conducted a wants and warrants check on defendant. See Segura Decl. ¶ 11; Owen Decl. ¶ 7. The dispatcher informed Owen that defendant had two outstanding warrants and that he was on parole for a weapons violation. Owen Decl. ¶ 7. Owen returned to defendant's porch and informed Segura and Pasache of the results of the wants and warrants check. Segura Decl. ¶ 11; Pasache Decl. ¶ 9. Armed with the knowledge that defendant had two outstanding warrants for his arrest, the officers had the constitutional authority to enter defendant's house to arrest him. See Payton, 445 U.S. at 603.

Defendant argues that the government has not adequately established the existence of a felony arrest warrant issued by a neutral magistrate upon a showing of probable cause. Deft.'s Supp. Reply at 3. The Ninth Circuit has held, however, that a misdemeanor arrest warrant

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA               O

**CRIMINAL MINUTES - GENERAL**

permits entry into a residence to effectuate a valid arrest. See United States v. Gooch, 506 F.3d 1156, 1159 (9th Cir. 2007). In Gooch, an officer pursuing a suspect on foot heard the suspect enter a residence. Id. at 1157. While waiting for backup to arrive, the officer received a radio dispatch confirming that there was a misdemeanor warrant for the suspect's arrest. Id. Once backup arrived, the officers entered the residence to search for the suspect. Id. at 1157–58. Once inside, the officers observed evidence suggesting heroin use. Id. at 1158. In affirming the district court's denial of the motion to suppress the evidence, the Ninth Circuit held that a valid arrest warrant issued by a neutral magistrate judge, irrespective of what the warrant was issued for, carries with it the authority to enter a residence to effectuate the arrest under Payton. Id. at 1169.

As in Gooch, before entering defendant's residence, the officers learned that there were warrants for defendant's arrest. Contrary to defendant's argument, it is not necessary for the government to establish that the warrant was for a felony. Defendant's interests in protecting his privacy from uncabined police discretion are "sufficiently safeguarded when an entry is premised on the execution of a valid arrest warrant issued by a judge or magistrate, regardless of whether that warrant is for a felony, a misdemeanor, or simply a bench warrant for failure to appear." Gooch, 506 F.3d at 1159.[10]

Defendant further argues that the government has failed to establish the existence of any particular arrest warrant. Deft.'s Supp. Reply at 4. To the contrary, the Court heard testimony from three officers explaining that they had learned of defendant's arrest warrants prior to entering his residence. Moreover, defendant entered into evidence the tape of the radio dispatcher informing Owen that defendant had two warrants for his arrest. Reply Ex. C. Thus, defendant's argument appears to boil down to the contention that because the government has not produced the physical warrants, it has not carried its burden of demonstrating that the officer's entry into the residence was reasonable. However, the officers were permitted to reasonably rely on the radio dispatcher's statement that defendant had two warrants for his arrest, see Rohde v. City of Roseburg, 137 F.3d 1142, 1143–44 (9th Cir. 1998) (holding that an officer's good faith reliance on facts provided by a police radio dispatcher can be sufficient to establish probable cause), and there is no requirement that the government actually enter the physical warrants into evidence.

---

[10] The Court further concludes that the officers had probable cause to believe that defendant was present when they entered his residence because defendant himself answered the door and provided the officers with his driver's license. See United States v. Gorman, 314 F.3d 1105, 1111–15 (9th Cir. 2002).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                O

**CRIMINAL MINUTES - GENERAL**

      Moreover, it is irrelevant that Segura testified that the ostensible reason for visiting defendant's residence was to obtain defendant's consent to search for drugs. Segura Decl. ¶ 9. In United States v. Whren, the Supreme Court held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and that "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." 517 U.S. 806, 813 (1996). The Court explained that "subjective intent alone does not make otherwise lawful conduct illegal or unconstitutional . . . . We . . . have[e] established that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Id. (internal alterations and quotations omitted); see Davenpeck v. Alford, 543 U.S. 146, 153 (2004) (an officer's "subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause."); see also United States v. Ibarra, 345 F.3d 711, 714 (9th Cir. 2003) ("Whren foreclosed the possibility that a search or seizure may be invalidated solely because of the subjective intentions of a state officer.").

      Accordingly, the Court concludes that the officer's knowledge of defendant's outstanding arrest warrants authorized them to enter the residence to effectuate defendant's arrest.[11]

    **3.**      **Seizure of Defendant**

---

[11] The government further maintains that the entry and search of defendant's residence was valid under the Fourth Amendment because defendant was on parole and subject to a search condition. Opp'n at 9. The Court disagrees. The Supreme Court has held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." Samson v. California, 547 U.S. 843, 857 (2006). However, the officer must have advance knowledge of the individual's parole status, and that the individual is subject to warrantless search as a condition of his parole, before commencing the suspicionless search. United States v. Caseres, 533 F.3d 1064, 1076 (9th Cir. 2008); Moreno v. Baca, 431 F.3d 633, 641 (9th Cir. 2005) ( "police officers cannot retroactively justify a suspicionless search and arrest on the basis of an after-the-fact discovery of . . . a parole condition."). In this case, as in Caseres, Segura only knew that defendant was on active parole for weapons possession, but had no advanced knowledge that defendant was subject to warrantless searches as a condition of his parole. See Caseres, 533 F.3d at 1067. Because there is no evidence in the record that Segura, or any other officer at the scene, had definitive knowledge that defendant was subject to a search condition before entering his residence, defendant's status as a parolee does not provide an independent legal basis for the entry and search of his residence. See id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CRIMINAL MINUTES - GENERAL**

Defendant was first seized by Segura at or just inside the doorway of his residence.[12]

For seizures that do not amount to a full arrest, police may detain or seize an individual for brief, investigatory purposes, if the officers have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); see United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009). "To determine whether [an investigatory] stop was supported by reasonable suspicion, [the court] consider[s] whether, in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Palos-Marquez, 591 F.3d 1272, 1274–75 (9th Cir. 2010) (internal quotations omitted). Here, Segura had reasonable articulable suspicion that defendant may be armed based on his knowledge that defendant was on active parole for a weapons violation, had two outstanding warrants, and because, contrary to Segura's instructions, defendant was intermittently obscuring his hands behind his back.

Relying upon United States v. Crapser, 472 F.3d 1141, 1148–49 (9th Cir. 2007), defendant argues that the officers had no authority to conduct the pat down search because when Segura first seized defendant, he was standing inside his home. Deft.'s Supp. Mem. at 7–8. Police may not conduct a Terry stop based on reasonable suspicion when the suspect is inside his home. Id.; see United States v. Martinez, 406 F.3d 1160, 1165 (9th Cir. 2005) ("Certainly, the usual rules pertaining to Terry stops do not apply in homes."); United States v. Washington, 387 F.3d 1060, 1067 (9th Cir. 2004) (the Supreme Court "has never expanded Terry to allow a Terry-stop at an individual's home."); United States v. Winsor, 846 F.2d 1569, 1574, 1577–78 (9th Cir. 1988) (en banc) (declining to extend Terry's reasonable suspicion standard to an in-home warrantless search). However, Crapser establishes that where a "suspect voluntarily opens the door of his residence in response to a non-coercive 'knock and talk' request, the police may temporarily seize the suspect *outside the home* (or at the threshold) provided that they have reasonable suspicion of criminal activity." Crapser, 472 F.3d at 1148–49 (emphasis in original).

Crapser is distinguishable, however, because in this case, the officers were authorized to enter defendant's residence to effectuate his arrest based on his two outstanding arrest

---

[12] Based on the totality of the testimony at the suppression hearing, it appears that defendant was standing just inside the doorway to his home, with the door slightly ajar, when he was seized by Segura.

warrants.[13] The Court perceives no reason why, if the officers were permitted to enter defendant's residence to arrest defendant, they were not permitted to enter the residence to conduct a pat-down search for weapons based on reasonable articulable suspicion that defendant may be armed. Accordingly, the Court concludes that the original seizure of defendant at or just inside his doorway was constitutional.

### 4. Protective Sweep and Defendant's Subsequent Consent

After a physical altercation with the officers, defendant was ultimately arrested inside his living room. Following a home arrest, "the arresting officers are permitted . . . to take reasonable steps to ensure their safety." Maryland v. Buie, 494 U.S. 325, 334 (1990). There are two types of searches officers might conduct immediately following an arrest in the home for which a search warrant is not required. United States v. Lemus, 582 F.3d 958, 962 (9th Cir. 2009) (citing Buie, 494 U.S. at 333–34). First, the officers may conduct a search incident to the arrest without probable cause or reasonable suspicion, of the areas immediately adjoining the place of arrest from which an attack could be immediately launched. Lemus, 582 F.3d at 962. "Second, the officers can perform a further protective sweep beyond immediately adjoining areas when there are 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbored an individual posing a danger to those on the arrest scene.'" Id. (citing Buie, 494 U.S. at 334). Based on Pasache's testimony that as the officers apprehended defendant in the living room, a male and female entered the room from an adjoining hallway, the officers had articulable facts which would warrant them in believing that there may be other individuals present in the residence that posed a danger to them.[14] Pasache Decl. ¶ 14. Thus, the officers' protective sweep of defendants' residence did not violate his constitutional rights.

After the officers discovered the cooler in plain view during the protective sweep, defendant ultimately consented to the further search of his residence. Defendant appears to

---

[13] Accordingly, the Court does not reach whether defendant was at the threshold or inside of his home when he was seized by Segura. See Capser, 472 F.3d at 1149.

[14] The Court reserves judgment on whether the search of the garage, where the officers discovered the cooler identical to that observed in the photograph on Garcia's cell phone, was also authorized as a "protective search incident to arrest." See Lemus, 482 F.3d at 963. The record does not conclusively establish that the garage was immediately adjoining the living room where defendant was arrested. See, e.g., Pasache Decl. ¶ 13.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

concede that he voluntarily consented to this search.[15] After carefully reviewing the totally of the circumstances, the Court concludes that defendant's oral and written consent to the search of his residence was supplied voluntarily. Schneckloth, 412 U.S. at 226 ("the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). Although the officers informed defendant that they were going to obtain a search warrant, at the time, it appears there was ample probable cause to support a search warrant for defendant's residence. See United States v. Kaplan, 895 F.2d 618, 622 (9th Cir. 1990) ("consent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue.") (citing United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983)). Thus, in view of the totality of the circumstances, the Court finds that the officers' subsequent search of the residence was authorized by defendant's voluntary consent.

### IV.   CONCLUSION

In accordance with the foregoing, the Court hereby DENIES defendant's motions to suppress.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |

---

[15] Instead, defendant maintains that his consent was tainted by the officers' illegal entry into his home. Reply at 7–8; Supp Reply at 8–9 (citing United States v. Washington, 387 F.3d 1060, 1072 (9th Cir. 2004)). Because the officers' entry into the residence did not violate defendant's constitutional rights, his subsequent consent is not tainted or otherwise invalid.